[Cite as *State v. Mounts*, 2023-Ohio-3861.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-210608 |
| | | TRIAL NO. B-1801231 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| JOSHUA MOUNTS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From:   Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: October 25, 2023

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Keith Sauter*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Paul Croushore*, for Defendant-Appellant.

**KINSLEY, Judge.**

{¶1} Defendant-appellant Joshua Mounts appeals from his conviction for felony murder in violation of R.C. 2903.02(B) in connection with the death of his seven-month-old son J.F. In four assignments of error, Mounts argues his conviction was against the manifest weight of the evidence, that the trial court erred in prohibiting his expert witnesses from testifying outside the scope of their expert reports while allowing the state's expert witnesses to do the same, that the state improperly presented a lay witness as an expert witness and allowed him to testify to evidence of Mounts's guilt, and that the prosecutor's comments during rebuttal argument amounted to prosecutorial misconduct. In his brief, Mounts pointed out on a number of occasions that he does not challenge whether he received constitutionally effective representation at his trial, expressly reserving that issue for another day.

{¶2} In reviewing the limited assignments of error Mounts raises on appeal, we hold that Mounts has not demonstrated that the jury lost its way and created a manifest miscarriage of justice. We further hold that Mounts waived any claim of error regarding the scope of expert testimony and that the state did not improperly present a lay witness as an expert witness. Lastly, we hold that, in most instances, Mounts waived all but plain error by failing to object to the prosecutor's comments during rebuttal argument and that under the plain-error doctrine, these comments did not amount to prosecutorial misconduct. In the one instance in which Mounts preserved an objection, we hold that the prosecutor's comments in closing argument were not improper. Accordingly, we overrule each of Mounts's assignments of error and affirm the judgment of the trial court.

***Factual and Procedural Background***

{¶3} On the early afternoon of January 25, 2018, Emergency Medical Services ("EMS") responded to a 911 call for J.F., who was found unresponsive after spending the night alone with Mounts. J.F. was admitted to Cincinnati Children's Hospital, where he was treated for a skull fracture. Because J.F.'s mother, Kayla Fitzugh, was told by J.F.'s care team that J.F. had no chance of recovery due to severe brain damage, she made the decision to take J.F. off of life support.

{¶4} The state subsequently charged Mounts with one count of aggravated murder in violation of R.C. 2903.01(C) and one count of felony murder in violation of R.C. 2903.02(B) in connection with the death of J.F.

{¶5} At trial, Kayla testified that she was the primary caretaker of J.F. and lived with her grandparents, while Mounts resided with his parents and visited J.F. weekly. Kayla testified that she had previously used unprescribed drugs, but had stopped using a week after she learned that she was pregnant with J.F. Kayla further testified that J.F. was born prematurely and had experienced at least one "Brief Unresolved Event" ("BRUE episode"), which had caused J.F. to stop breathing. She testified that J.F. had not had such an episode for months prior to becoming unresponsive in Mounts's care.

{¶6} She also testified that J.F. had been to the hospital six months prior to his death for two instances of a cold. Kayla testified that J.F. was a happy baby who had just started talking, had no recent change in temperament, and had never been dropped. She testified that J.F.'s usual routine included waking up between 8:00 and 9:00 a.m. and that he rarely slept past that time. She also testified that J.F. slept on his back and in his own crib.

3

{¶7} Kayla testified that the day before J.F. was found unresponsive, she and J.F. had spent the day with Mounts. She also testified that she saw Mounts purchase drugs that day. She did not notice anything unusual in J.F.'s behavior before she left him in Mounts's care. After realizing that she had an appointment scheduled for the following morning, she decided to leave J.F. in Mounts's care overnight. She testified that she departed the Mounts residence at approximately 11:00 p.m. that evening.

{¶8} Kayla testified that before her appointment the following morning, she received a text message from Theresa Mounts, Mounts's mother, stating, "911 emergency. Call me." Per Kayla's testimony, EMS informed her that they were present at the Mounts's residence and that J.F. was not breathing. She testified that she was told to go to Cincinnati Children's Hospital immediately, but when she arrived, Mounts was not there. As Kayla recounted, Mounts told her that he had begged EMS for a ride to the hospital but was refused assistance, because he did not have custody.

{¶9} Kalya testified that J.F. was taken to the Pediatric Intensive Care Unit and was treated for a fracture. She stated that Mounts denied that J.F. had fallen out of the bed when she asked. She testified that although Mounts appeared visibly upset when she saw him in the parking lot of the hospital, Mounts never came inside the hospital to see J.F.

{¶10} Officer Darian Bookman, a retired officer with the Sharonville Police Department, was a first responder at Mounts's residence. At trial, Bookman testified that when he arrived on the scene and asked Mounts what happened, Mounts told him that J.F. had slept through the night and woken up crying around 11:00 a.m. He further testified that Mounts told him that after getting up to make J.F. a bottle, he came back to find J.F. unresponsive. Bookman recounted his observations of

Mounts's bedroom, noting that the bottle Mounts referenced was still warm when he picked it up, that the bed had been pushed against a wall presumably to prevent J.F. from rolling off, and that he noticed a device commonly used for smoking marijuana.

{¶11} Benjamin Casteel, a clerk for the city of Sharonville and former firefighter and paramedic for the Springfield Township Fire Department, was also present at the scene. At trial, Casteel testified that at the time he arrived, J.F. was already being carried inside an ambulance. Casteel testified that Mounts was unsure of J.F.'s date of birth and medical history. Casteel also recalled that he found it unusual that Mounts was rather distant in discussing J.F.'s condition. He further testified that Mounts refused his offer to take a ride with EMS to the hospital.

{¶12} Dr. Kathi Makoroff, a doctor at Cincinnati Children's Hospital and an expert in child-abuse pediatrics, also testified at trial. She testified that J.F. had a skull fracture on the right parietal bone and subdural bleed on the left side of his head. She further testified that for a child of J.F.'s age, a fracture like this would not have happened spontaneously, and this was an indication of some kind of trauma.

{¶13} Dr. Dorothy Dean, a forensic pathologist at the Hamilton County Coroner's Office, performed J.F.'s autopsy. At trial, Dr. Dean testified that she found bruising on J.F.'s back that could have been caused by shaking, as the marks were consistent with fingerprints. She also testified that there was fresh blood near the fracture site and that there was no evidence of healing, which indicated that this was a very recent injury. Dr. Dean did not believe the BRUE episodes had anything to do with J.F.'s cause of death. Rather, she testified that J.F. had likely died from traumatic brain injury with a skull fracture due to blunt impacts to his head.

{¶14} Dr. Dean further testified that J.F.'s skull fell apart in her hands when she made cuts, which indicated that the bone had not yet formed the fibrous tissue that cells generate when healing a new fracture. She testified that when looking at the fracture microscopically, she saw a fresh fracture and did not see any evidence of healing. She also testified that she provided Mounts's expert witnesses with recuts of histology slides from J.F.'s autopsy, but that these experts could have come into the office to view the original slides in person. And she testified that if there had been any substantial difference between the original and recut slides, she would have informed Mounts's expert witnesses.

{¶15} Detective Brad Hondorf, a police officer for the city of Sharonville and the lead detective in the investigation surrounding J.F.'s death, also testified at trial. He testified that Officer Bookman gave him a report from Cincinnati Children's Hospital which noted suspected abuse in J.F.'s case. He also testified that he interviewed Mounts over the phone and Mounts told him that J.F. was not acting abnormally before he became unresponsive. But on cross-examination, Hondorf admitted that Mounts had told him that J.F. had a deer-in-headlight stare when he looked at light, but Hondorf did not relay this information to Dr. Dean during the course of his investigation. Hondorf further testified that he obtained a search warrant and subpoena for Kayla's and Mounts's Facebook messages, and in these messages, Mounts had relayed to Kayla that he was refused a ride to the hospital, because he did not have custody of J.F.

{¶16} At the close of the state's case, Mounts moved for an acquittal under Crim.R. 29. The trial court denied Mounts's motion.

{¶17} Dr. Andrea Wiens, Dr. Satish Chundru, and Dr. Andrew Guajardo testified as expert witnesses for Mounts. They were all in agreement that the blood near the fracture site they identified was not fresh and that there was evidence of healing, which indicated that J.F.'s injuries were not recent. Dr. Wiens also testified that with repeated BRUE episodes, there was a greater likelihood that there was an underlying etiology for J.F.'s condition that had not yet been found.

{¶18} Returning from a break in her testimony, Dr. Wiens attempted to testify as to the original histology slides that were not included in her expert report, but the state objected to her testifying to information outside of her expert report. During a sidebar to discuss the state's objection, Mounts's counsel agreed to move on from this line of questioning. After defense counsel essentially abandoned the attempt to have Dr. Wiens testify about the original histology slides, the trial court sustained the state's objection.

{¶19} Dr. Chundru testified that Dr. Dean may have mislabeled some slides and that he was shocked by her diagnosis of J.F. Dr. Guajardo testified that J.F.'s injuries were a minimum of three weeks or older.

{¶20} Theresa Mounts testified as a witness for Mounts. She testified that she noticed J.F. was not making eye contact with her on the date of the incident and that he had a blank stare. On cross-examination, Theresa testified that she did not relay this information to either the police officers investigating J.F.'s death or the physicians that were treating him. Mounts did not testify.

{¶21} On rebuttal, the state played the deposition of Dr. Rebecca Folkerth. Dr. Karen Looman, Chief Deputy Coroner at the Hamilton County Coroner's Office, also testified on rebuttal. She testified that she agreed with Dr. Dean's findings. And Dr.

Dean testified again on rebuttal, emphasizing that she was still confident in her findings.

{¶22} The jury found Mounts guilty of felony murder but acquitted Mounts of aggravated murder. Mounts filed a motion for a new trial and an acquittal, which the trial court denied. Mounts was sentenced to an aggregate sentence of 15 years to life imprisonment. He now appeals.

### Manifest Weight

{¶23} When reviewing a challenge to the manifest weight of the evidence,[1] we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 388, 678 N.E.2d 541 (1997). Unlike our review of a sufficiency challenge, review of a manifest-weight challenge requires us to independently "review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice." *State v. Powell*, 1st Dist. Hamilton No. C-190508, 2020-Ohio-4283, ¶ 16, citing *Thompkins* at 397. "A manifest-weight argument * * * challenges the believability of the evidence." *State v. Carter*, 1st Dist. Hamilton No. C-220041, 2023-Ohio-18, ¶ 12.

{¶24} However, we will reverse the trial court's decision to convict and grant a new trial only in " 'exceptional cases in which the evidence weighs heavily against the conviction.' " *State v. Sipple*, 1st Dist. Hamilton No. C-190462, 2021-Ohio-1319, ¶ 7. "This is because the weight to be given [to] the evidence and the credibility of the

---

[1] Though Mounts also includes the standard of review for a sufficiency challenge, he does not develop this argument. Pursuant to App.R. 16(A)(7), "an appellant must provide an argument and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which the appellant relies." (Internal quotation marks omitted.) *State v. Covington*, 1st Dist. Hamilton No. C-190731, 2021-Ohio-2907, ¶ 25. Accordingly, we do not consider Mounts's sufficiency challenge here.

witnesses are primarily for the trier of the facts." (Internal quotation marks omitted.) *Carter* at ¶ 13.

**{¶25}** In his first assignment of error, Mounts argues the state's case was conjectural or unsupported by the evidence. He further asserts that the only evidence supporting the argument that he struck J.F. was that J.F. had a skull fracture and marks on his head. But the evidence supporting Mounts's conviction was not as limited as he suggests.

**{¶26}** Each of the state's expert witnesses testified that there was fresh blood near the fracture site and no evidence of healing, indicating that J.F.'s injuries were recent. In particular, Dr. Makoroff testified that on the day that J.F. was brought to Cincinnati Children's Hospital, she was asked to evaluate him. She further testified that she specialized in child-abuse pediatrics and that she believed J.F.'s injuries were caused by some kind of trauma. Though Mounts's expert witnesses testified to the contrary, the jury was free to give less weight to their testimony and more weight to the testimony of physicians who had physically evaluated J.F., including Dr. Makoroff and Dr. Dean. "Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses." *State v. Johnson*, 1st Dist. Hamilton No. C-170354, 2019-Ohio-3877, ¶ 52.

**{¶27}** Additionally, Kayla testified that J.F. had never been dropped before and that he was behaving normally before she left him with Mounts. Theresa testified that on the day Kayla left J.F. with Mounts, she observed that J.F. had a blank stare and would not make eye contact with her. But on cross-examination, Theresa testified that she did not note these oddities in J.F.'s behavior when speaking with the police or

J.F.'s physicians. Moreover, Theresa testified on cross-examination that she did not see J.F. often.

{¶28} Kayla also testified that she saw Mounts purchase drugs the day before J.F. died and that he was the sole caregiver present when J.F. stopped breathing. Further, Casteel testified that Mounts refused his offer for a ride when J.F. was taken to the hospital.

{¶29} All of this evidence, taken together, may have undercut Mounts's theory of the case in the eyes of the jury. Moreover, even reviewing the evidence in the best light for Mounts, there were competing experts on both sides and lay-witness testimony supporting the state's version of events. We therefore cannot say that the evidence points overwhelmingly against conviction. On this record, Mounts has therefore not demonstrated that the jury lost its way and created a manifest miscarriage of justice. Mounts's first assignment of error is accordingly overruled.

### *Scope of Expert Testimony*

{¶30} Crim.R. 16(K) requires that "expert witnesses generate written reports and that those reports be disclosed to the opposing party no later than 21 days before trial." *State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44, ¶ 46. In this way, Crim.R. 16(K) "avoid[s] unfair surprise by providing notice to the defense and allowing the defense an opportunity to challenge the expert's findings, analysis, or qualifications." (Internal quotation marks omitted.) *Id.* at ¶ 48. Further, we have held that "Crim.R. 16(K) removes the trial court's discretion and requires the exclusion of expert testimony when a written report has not been disclosed in accordance with the rule." *Id.* at ¶ 52, citing *State v. Hall*, 1st Dist. Hamilton Nos. C-170699 and C-170700, 2019-Ohio-2985, ¶ 20.

{¶31} Here, Mounts asserts that the trial court erred in prohibiting Dr. Wiens from testifying to information outside the scope of her expert report. At trial, the state objected to Dr. Wiens testifying to an original histology slide she had not seen prior to the trial and failed to include in her report. The state asserted that Dr. Wiens was provided with a recut slide and that she did not request to see the original slide when she had the opportunity, and it attempted to prohibit her testimony on this basis. When the trial court inquired as to the purpose of Dr. Wiens testifying to the original slide, Mounts's counsel provided contradictory reasoning. Initially, he asserted that the recut slides had "some differences" from the original slides. Later, he asserted:

> This testimony answers that question about how [Mounts's expert witnesses] have an opinion of two sides of a healing fracture. They are looking at the *same* thing, that's my point, and nothing that they're talking about here is anything new. It comes down to the critical issue of what these three experts were looking at. They are going to testify they are looking at the fracture.

(Emphasis added.)

{¶32} Then, when the trial court inquired as to the difference between the slides, Mounts's counsel replied, "at the fracture site, her testimony is there's a slight ridge that contains – and I could be misquoting this – it's going to have bone formation as well as healing blood within it. That is never mentioned in Dr. Dean's report because it's a different slide."

{¶33} Before the trial court could make a ruling as to the objection, it offered Mounts the opportunity to submit an amended expert report for Dr. Wiens. But Mounts's counsel stated he could "move off of this particular slide." And when the

trial court sustained the objection to the extent that Dr. Wiens would testify to new information outside of her report, Mounts's counsel again stated he would "move on."

{¶34} As an initial matter, it is not entirely clear whether Mounts was trying to elicit testimony that these slides were substantially the same or different. But even if it was clear, Mounts failed to preserve this alleged error for appellate review by acquiescing to the state's objection to Dr. Wiens's testimony. *See, e.g., State v. Phillips*, 4th Dist. Pickaway Nos. 89-CA-32 and 89-CA-33, 1992 Ohio App. LEXIS 1016, 24 (Mar. 5, 1992); *State v. Gentry*, 10th Dist. Franklin No. 83AP-384, 1984 Ohio App. LEXIS 8718, 3 (Feb. 16, 1984). Not only did Mounts ignore the trial court's offer to submit an amended expert report for Dr. Wiens, but he also agreed not to elicit testimony from Dr. Wiens as to the original slide *before* the trial court ruled on the state's objection. Accordingly, Mounts has waived any claim of error here, and his second assignment of error is overruled.

{¶35} In presenting this assignment of error, Mounts also points to comments by the state in its rebuttal closing in which the state suggested that the recut slides were less accurate than the original slides. Mounts argues that these comments demonstrate the prejudice of prohibiting Dr. Wiens's testimony as to the original slides. But because Mounts's counsel failed to preserve an issue with regard to Dr. Wiens's testimony, we do not consider the prosecutor's statements in closing argument as to whether Dr. Wiens's testimony was admissible. Moreover, to the extent Mounts argues that the prosecutor's comments themselves were improper, we address that issue later in this opinion. In short, because Mounts did not object to these comments at trial, we are limited to plain-error review, and the elements of the plain-error doctrine are not met here.

{¶36} Lastly, Mounts contends without explanation that the trial court erred in prohibiting Dr. Guajardo from testifying outside the scope of his expert report, while allowing Dr. Looman and Dr. Dean to do the same. As the state correctly notes, however, Mounts completely abandons these undeveloped arguments regarding the testimony of Dr. Guajardo and Dr. Looman. Pursuant to App.R. 16(A)(7), an appellant must provide "an argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." "[W]e will consider all cognizable contentions presented but will not create an argument if a * * * litigant fails to develop one." *Marreez v. Jim Collins Auto Body, Inc.*, 1st Dist. Hamilton No. C-210192, 2021-Ohio-4075, ¶ 4. Thus, we overrule this undeveloped aspect of Mounts's claim and overrule Mounts's second assignment of error in full.

### *Lay Testimony as to Evidence of Guilt*

{¶37} In his third assignment of error, Mounts argues the trial court erred in admitting the testimony of Casteel. Mounts makes two separate contentions as to Casteel's testimony. First, Mounts argues that Casteel, a lay witness, was improperly presented as expert witness by the state. Second, Mounts argues that Casteel should not have been allowed to testify that Mount's behavior was evidence of guilt.

{¶38} Decisions regarding the admissibility of evidence are reviewed for an abuse of discretion. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032.

{¶39} As to the first argument, Mounts's belief that Casteel was held out as an expert witness is wholly misplaced. The state did not in any way hold out Casteel as

an expert, did not move to qualify him as such, and did not submit a resume or expert report that would have given the impression that Casteel was an expert.

{¶40} At most, the state asked Casteel about the details of his job history as a firefighter and paramedic. And Casteel's testimony as to these details did not qualify him as an expert. For example, the fact that Casteel testified that he held that position for almost two decades did not qualify or present him as a court-defined expert, but rather emphasized his credibility on the subject just as any layperson in a seasoned job role would have credibility to speak to the nuances of his or her own profession.

{¶41} As to the second issue, Evid.R. 701 governs opinion testimony by lay witnesses. *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 59. The rule provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

{¶42} In *Graham*, the Ohio Supreme Court held that the lay witness's testimony satisfied both requirements of Evid.R. 701, reasoning that the lay witness's observation of the defendant's demeanor was relevant to showing the defendant's evasiveness. *Id.* at ¶ 60. In the same way, Casteel observed Mounts's withdrawn and distant behavior when EMS arrived on scene, and this was relevant in showing Mounts's reaction to J.F.'s dire condition. Like that in *Graham*, Casteel's testimony meets both requirements of Evid.R. 701.

**{¶43}** First, Casteel's testimony was rationally based on his own perception, having been both personally present at the scene and well-versed in emergency situations such as this one. Second, Casteel's observations were helpful to a clearer understanding of his testimony about Mounts's casual demeanor when his child was in life-threatening distress. Importantly, the jury was free to weigh this evidence either for or against Mounts's guilt.

**{¶44}** For these reasons, the trial court did not abuse its discretion in admitting Casteel's testimony, and the third assignment of error is accordingly overruled.

### *Prosecutorial Misconduct*

**{¶45}** In his fourth assignment of error, Mounts asserts that certain comments made by the prosecutor in rebuttal arguments amounted to prosecutorial misconduct. Specifically, Mounts takes issue with the following comments:

A forensic person – according to Webster – and unless the Judge gives you a different definition in his jury instructions, you use the common word or the common definition for a word – forensic means you're trained in the law, trained for court.

\* \* \*

So Dr. Guajardo and Dr. Wiens are neuropathologists like Dr. Folkerth, but they're neuropathologists that are trained to come to court and trained to testify. And you got to consider that when you're considering their testimony. They're actual professional testifiers, is what they are.

\* \* \*

[Dr. Wiens] said that the cuts weren't always as good as the first section that was taken, or the first cut of the section afterwards made. And as you go down and down and you remember that it's kind of like somebody described it as slicing wool pants. And as it gets lower and lower, the cut, the recut, the legal recut that they were calling it, isn't as good.

And so Dr. Wiens says I – she says the first one isn't as good.

\* \* \*

The Defense witnesses called it a team when they were trying to explain why they didn't pick up the phone and call Dr. Dean. 'We're not on her team. We're on his team.'

\* \* \*

[Dr. Chundru's] got a big stake in the game. This is his business. You think he makes business by telling him, "I'm sorry; the doctor was correct." You think he makes business by advertising and by having the newspaper like The Washington Post in here covering this story \* \* \* writing an article about him coming to court and testifying, saving the day. Oh my gosh. He gave up his fee; that's how committed he is. You think he's not getting a benefit from being here?

\* \* \*

When you look at those medical records, I read a whole list of names to you that I subpoenaed. And I just want you to think about how long the trial would have been if we called every one of those doctors. Dr. Lauren Jacobs, Amy Holden, Meredith Drake, Hee Kyung, Bernadette Koch,

Marguerite Care, Julie Guerin, Maya Linn Dewan. They're all part of the treatment team treating [J.F.], trying to [save] his life, and treating him as if he was a victim of child abuse and blunt force trauma, recent injuries.

\* \* \*

It's all these doctors who – incidentally, every one of these doctors are licensed to practice medicine and actively practice medicine in the State of Ohio. Not these outside doctors who can come in here for money and say what they want to say and then fly back off to wherever they have to fly back off to and hope that you believe what they say.

{¶46} "The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether the remarks prejudicially affected the accused's substantial rights." *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 238. And when reviewing alleged prosecutorial misconduct, "we must consider all of the prosecutor's remarks, irrespective of whether the defense preserved an objection." (Internal quotation marks and citations omitted.) *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 385.

{¶47} Here, Mounts only objected to the prosecutor's comment regarding Dr. Chundru, and thus this is the only statement that is preserved for our review. But this particular comment did not amount to prosecutorial misconduct. This is the case because evidence of bias and pecuniary interest is a legitimate subject of inquiry with respect to an expert witness. "Reasonable inferences and deductions may be drawn from evidence adduced at trial, \* \* \* and an expert's bias and pecuniary interest are fair subjects for a closing argument." (Citations omitted.) *Hyden v. Kroger Co.*, 10th

Dist. Franklin No. 06AP-446, 2006-Ohio-6430, ¶ 21. Because the prosecutor was merely highlighting the potential influence of The Washington Post's reporting on Dr. Chundru's motivations to testify, the prosecutor's remarks were not improper and did not affect Mounts's substantial rights. *See Dean* at ¶ 238.

{¶48} Because Mounts did not object at trial to the remaining statements he now challenges on appeal, our review of those comments is limited to plain error. *See State v. West*, 168 Ohio St.3d 605, 2022-Ohio-1556, 200 N.E.3d 1048, ¶ 22.

{¶49} The Ohio Supreme Court most recently explained the plain-error doctrine in *State v. Bailey*:

> Under the plain-error doctrine, intervention by a reviewing court is warranted only under exceptional circumstances to prevent injustice. To prevail under the plain-error doctrine, [the appellant] must establish that an error occurred, that the error was obvious, and that there is a reasonable *probability* that the error resulted in prejudice, meaning that the error affected the outcome of the trial.

(Internal quotation marks and citation omitted.) *State v. Bailey*, Slip Opinion No. 2022-Ohio-4407, ¶ 8.

{¶50} The court in *Bailey* did not explain what it meant by defining prejudice based upon the impacts of the plain error on the outcome of the trial. However, in previous cases, the Ohio Supreme Court has held that, to demonstrate that error affected the outcome of the trial, the defendant must show that *but for* the error, the outcome of the proceeding would have been otherwise. *West* at ¶ 22.

{¶51} For example, in *State v. Brunson*, the Ohio Supreme Court rejected a plain-error claim, because the defendant could not demonstrate a reasonable

probability that but for his inability to cross-examine a witness using a recorded statement, the result of the trial would have been different. *State v. Brunson*, Slip Opinion No. 2022-Ohio-4299, ¶ 25.

**{¶52}** Reading *Bailey* in concert with *West* and *Brunson*, we hold that, under the plain-error standard, Mounts must demonstrate that a reasonable probability that but for these comments made by the prosecutor, the outcome of the trial would have been different.

**{¶53}** Most of the comments Mounts did not object to touched on the possible bias, prejudice, or pecuniary interest of Mounts's expert witnesses. These comments, including calling Dr. Guajardo and Dr. Wiens "professional testifiers," referring to Mounts's expert witnesses as a "team," and noting that Mounts's expert witnesses were licensed outside of Ohio, emphasized the motivation for Mounts's expert witnesses to testify and their potential biases. Though unartfully stated, these are not comments which are "so inflammatory as to render the jury's decision a product solely of passion and prejudice." *See Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, at ¶ 385.

**{¶54}** For example, in *State v. Debardeleben*, during cross-examination of the defendant's expert witness, the prosecutor noted, "I don't want to keep you from your next endeavor * * * Your next baby death case." (Internal quotation marks omitted.) *State v. Debardeleben*, 8th Dist. Cuyahoga No. 108277, 2020-Ohio-661, ¶ 38. The trial court admonished these comments as inappropriate and prejudicial. *Id*. at ¶ 38. The appellate court, however, held that the defendant did not demonstrate a reasonable probability that but for these comments the outcome of the trial would have been different. *Id*. at ¶ 39.

{¶55} Likewise, here, we note that the prosecutor could have exercised more restraint and caution in pointing out the possible bias, prejudice, or pecuniary interest of Mounts's expert witnesses. But we do not conclude that but for these comments, the outcome of the trial would have been different. *See West*, 168 Ohio St.3d 605, 2022-Ohio-1556, 200 N.E.3d 1048, at ¶ 22.

{¶56} The prosecutor's statement regarding potential expert witnesses for the state who could have testified but did not, however, is more egregious. Because Mounts was the only witness at the time J.F. stopped breathing, expert testimony as to the cause and manner of J.F.'s death was particularly important in this case. In reaching its verdict, the jury was necessarily required to weigh the testimony of the state's three expert witnesses against the testimony of Mounts's three expert witnesses. By alluding to additional expert witnesses on behalf of the state, the prosecutor may have improperly tipped the weighing of expert witness testimony in favor of the state.

{¶57} But, despite the importance of expert witness testimony in this case, the jury had other evidence of Mounts's conduct to consider as well. *See State v. Twyford*, 94 Ohio St.3d 340, 356, 763 N.E.2d 122 (2002) (holding that although it was improper for the prosecutor to comment on the defendant's failure to testify, there was other compelling evidence of the defendant's guilt and so he was not prejudiced or denied a fair trial). The jury may have found that evidence of Mounts's drug use and withdrawn behavior at the time of J.F.'s death undercut his theory of the case. And the jury may have found that Kayla's testimony regarding J.F.'s behavior prior to his death was more persuasive than Theresa's testimony, given Kayla was J.F.'s primary caregiver and J.F. spent minimal time with Mounts and his family. Moreover, as discussed

above, the jury may have more heavily weighed the testimony of Dr. Dean and Dr. Makoroff, given that they physically examined J.F. and the defense experts did not.

**{¶58}** As the Ohio Supreme Court emphasized in *Bailey*, "the plain-error doctrine is warranted only under *exceptional circumstances* to prevent injustice." (Emphasis added.) *Bailey*, Slip Opinion No. 2022-Ohio-4407, at ¶ 15. To that end, the instances in which this court, our sister courts, and the Ohio Supreme Court have found prosecutorial misconduct under plain-error review are few and far between. *See e.g., State v. Keenan*, 66 Ohio St.3d 402, 405-411, 613 N.E.2d 203 (1993) (holding that despite the defendant's failure to object to the prosecutor's improper comments during closing argument, these comments deprived the defendant of a fair trial where the prosecutor disparaged defense counsel, encouraged the jury to substitute emotion for reasoned advocacy, expressed his personal outrage, called the defendant an animal, and stabbed a large knife into counsel's table in front of the jury).

**{¶59}** With this context in mind, we cannot conclude that this case presents exceptional circumstances, as required by *Bailey*. We certainly do not condone, and in fact condemn, the prosecutor's insinuation that additional expert witnesses who did not testify would have bolstered the state's case. But without an objection from defense counsel at trial, we are limited by the application of the plain-error standard in our review. Given the jury had other evidence of Mounts's guilt to consider, we cannot conclude that but for this comment, the outcome of the trial would have been different. *See West*, 168 Ohio St.3d 605, 2022-Ohio-1556, 200 N.E.3d 1048, at ¶ 22.

**{¶60}** Finally, as to the prosecutor's comment regarding the quality of the recut slides, we note that the prosecutor incorrectly attributed Dr. Dean's testimony to Dr. Wiens. It was Dr. Dean, not Dr. Wiens, who analogized the difference between the

original and recut slides to slicing wool pants. Crucially, Dr. Dean also testified that the original and recut slides were "substantially the same," and that if there had been any differences between the slides, she would have notified Mounts's expert witnesses. The jury also heard testimony from Dr. Dean that Mounts's expert witnesses could have requested to see the original slides in person but did not do so. And Dr. Wiens never testified as to the quality of the recut slides. Therefore, no expert witness testified that the recut slides were "not as good" as the original slides, as the prosecutor appeared to suggest. But because the jury was able to consider the entirety of Dr. Dean's testimony, and because the prosecutor's arguments in closing argument are not testimony, we hold that the prosecutor's mischaracterization of part of Dr. Dean's testimony did not amount to reversible error under the plain-error doctrine.

{¶61} Accordingly, because the one comment to which defense counsel did object was not improper and because our review of the remaining comments is constrained to plain error because defense counsel did not object, we hold that none of the prosecutor's comments amounted to prosecutorial misconduct. We therefore overrule Mounts's fourth assignment of error.

### *Conclusion*

{¶62} For the reasons set forth above, we overrule each of Mounts's assignments of error. Therefore, we affirm the judgment of the trial court.

Judgment affirmed.

CROUSE, P.J., and ZAYAS, J., concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.