[Cite as *State v. Clarke*, 2024-Ohio-2921.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-230646 |
| | | TRIAL NO. B-2303846 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| | | |
| DARREN CLARKE, | : | |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: August 2, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *John D. Hill, Jr.*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Timothy J. McKenna,* for Defendant-Appellant.

**BOCK, Presiding Judge.**

{¶1} Roughly 30 minutes after R.W. and defendant-appellant Darren Clarke engaged in an altercation that left Clarke dazed on the ground, Clarke re-ignited the altercation and attacked R.W. Following a bench trial, the trial court convicted Clarke of felonious assault. On appeal, Clarke argues that his conviction is against the manifest weight of the evidence because he acted in self-defense, or that he attacked R.W. in a sudden fit of rage. We disagree. First, we hold that a fear of great bodily harm at the hands of an incapacitated person is objectively unreasonable. Second, kicking an incapacitated person in the head is excessive force. Third, a 30-minute period after a fight is a sufficient cooling-off period to dampen any passion or rage.

{¶2} Clarke also contends that he received constitutionally ineffective assistance of counsel because his attorney failed to present expert testimony of his mental state. But on direct appeal, Clarke can only speculate about what his hypothetical expert would explain. Therefore, he cannot show that there is a reasonable probability that the outcome of his trial would have been different.

{¶3} We overrule both assignments of error and affirm Clarke's conviction.

## I. Facts and Procedure

{¶4} After two late-night fights between Clarke and R.W. near elevators on the second floor of an apartment building, the state charged Clarke with felonious assault in violation of R.C. 2903.11(A)(1).

{¶5} At the bench trial, the state built its case primarily around surveillance footage from inside of the apartment building. A responding officer explained that the cameras near the elevators captured an initial "altercation" between Clarke and R.W. inside one elevator at roughly 10:45 p.m. The surveillance footage captured by a

2

hallway camera shows Clarke falling out of the elevator onto his back. Then R.W. stood in the elevator doorway over a visibly dazed Clarke. R.W. shoved Clarke's legs out of the elevator and walked to an adjacent elevator. Clarke stumbled and struggled to maintain his balance as he tried to stand. R.W. left in an elevator as a bystander helped Clarke to his feet.

{¶6} Roughly 30 minutes later, the footage shows R.W. inside of a different elevator. As an officer testified, R.W.'s hands were "down to his sides" and relaxed, nonchalantly tapping a rhythm with his right hand. Clarke exited from a second-floor apartment and walked to the elevators. An elevator door opened in front of Clarke. R.W. left the elevator and took two steps into the hallway. Clarke, then face-to-face with R.W., paused briefly before punching R.W., knocking him to the ground. As R.W. was motionless on the ground, Clarke, using great force, stomped on R.W.'s head five times. R.W. continued lying motionless and appeared to be unconscious.

{¶7} Clarke took a five-second break to use his cell phone, and then resumed his attack. Meanwhile, a resident came out of her apartment nearby and rushed to stop Clarke. Clarke held off the resident as he swung his leg back and kicked R.W.'s head three times with enough force to rotate R.W.'s body roughly 45 degrees. R.W. was initially lying parallel to the elevator doors after the first punch but ended up perpendicular to the elevators. Clarke continued fending off the resident as he kicked R.W. in the head two more times with force that caused R.W.'s head to jerk back and forth. With each kick, blood splattered across the hallway.

{¶8} Five more residents rushed to the scene as Clarke hovered over R.W. and then stomped on his head one final time. In total, Clarke delivered one punch and 13 kicks to R.W.'s head in 40 seconds. As multiple residents restrained Clarke, several

others attended to R.W., who was lying in a pool of blood. Three residents checked to see if R.W. had a pulse.

{¶9} An officer testified that R.W. had to be intubated. When an officer interviewed R.W. at a physical rehabilitation center, he had no memory of that night. That officer also interviewed Clarke, who said that his "head still hurt" when he saw R.W. exit from the elevator and that he was angered by the fact that R.W. failed to "acknowledg[e] the prior interaction."

*Self-defense and mitigation evidence*

{¶10} Clarke raised two arguments in his defense. First, he argued that he acted in self-defense. Alternatively, Clarke asserted that he acted in a sudden fit of rage, which mitigated the severity of the offense.

{¶11} In support, Clarke's friend testified that she was visiting Clarke on the night of the fights to help Clarke unpack, as he had just moved into his apartment. She described the first altercation between Clarke and R.W. on the elevator. She explained that R.W. was "intoxicated," "F'd up," and that she "just didn't like the look on his face." While she admitted that she and Clarke had consumed alcohol, she testified that R.W. "was very intoxicated" and that she "could smell it off of him."

{¶12} According to Clarke's friend, R.W. warned Clarke that he was too close to him in the elevator. She recalled that Clarke asked R.W. what he meant, and R.W. responded, "I said you too close. * * * [B]ack up. Back the 'F' up." She testified that Clarke told R.W. to "chill out," and R.W. threatened to " 'F' [Clarke] up" and Clarke should "know I kill people out here." Next, according to the friend, R.W. attacked Clarke and "just kept hitting him," so she pushed her way out of the elevator. Clarke's friend testified that she called the police, but they never arrived.

4

{¶13}   Clarke testified that he had "no clue" who R.W. was, or why he attacked Clarke in the elevator. The only thing he recalled was being hit by R.W.—he had no recollection of what followed. After the first altercation, Clarke checked on his friend and then went to a second-floor apartment across from the elevators.

{¶14}   Clarke explained that he was attempting to return to his fifth-floor apartment when the elevator doors opened, and R.W. emerged. He testified that, had he known that R.W. was on the elevator, he would have used the stairs.

{¶15}   According to Clarke, R.W. commented, "What's up, motherfucker" as he walked off the elevator, which made Clarke afraid of what R.W. would do next and believe that R.W. would attack him again. Clarke testified that he was "a tad bit" angry "but more so worried that I am going to be attacked again." Clarke was unsure of what R.W. was going to do, so he "reacted." He said that he struck R.W. out of fear and to prevent further injury—Clarke described it as "an out-of-body experience." Clarke testified that he continued to kick R.W. because he did not "know [R.W.]. He just attacked me out of nowhere so I don't know what he's capable of."

{¶16}   The trial court found Clarke guilty and explained its rejection of Clarke's self-defense and mitigation defenses. Beginning with the first altercation, the trial court found it "weird" that R.W. walked "over" Clarke and did not touch Clarke in the hallway. While it noted that Clarke's and his friend's testimony was somewhat self-serving, it found that "something happened in there."

{¶17}   But the trial court found that Clarke was not acting in a sudden fit of rage because there was not "enough time for him to say what's up, motherfucker, before you hit him." The trial court continued, "And even if he did he's walking away from you and it's a half an hour later. And he walks away from you and you clock him

5

and he's down, but you don't stop." And Clarke was "fine walking out of that -- [his] friend's [apartment]."

{¶18} The trial court also found that Clarke's force was excessive. It emphasized that R.W. was "down and you keep going and you keep going." Assuming Clarke "thought he was going to come and get you, whatever, * * * you can't do what you did to him. That is not reasonable."

{¶19} The trial court sentenced Clarke to four-to-six years in prison. Clarke appeals in two assignments of error, claiming that his conviction was against the manifest weight of the evidence and that he received ineffective assistance of counsel.

## II. Law and Analysis

{¶20} In his first assignment of error, Clarke argues that his felonious-assault conviction is against the manifest weight of the evidence. First, he maintains that the state failed to disprove his self-defense claim. The state disagrees and contends that "the video essentially speaks for itself." Second, he argues that he should have been convicted of aggravated assault as a lesser offense.

A. Clarke's fear of harm became unreasonable, and his force was excessive

{¶21} The trial court found that the state disproved Clarke's self-defense claim, so we must determine whether that finding is against the manifest weight of the evidence. *State v. Warth*, 1st Dist. Hamilton No. C-220477, 2023-Ohio-3641, ¶ 37. To do so, we must review " 'the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new

6

trial ordered.' " *State v. Bailey*, 1st Dist. Hamilton No. C-140129, 2015-Ohio-2997, ¶ 59, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶22} Clarke had the initial burden of producing evidence tending to support that (1) he did not create the situation leading to the affray; (2) he sincerely believed he was in imminent danger of great bodily harm or death from which he could escape only by using force; and (3) he did not violate a duty to retreat. *State v. Gowdy*, 1st Dist. Hamilton No. C-230644, 2024-Ohio-1765, ¶ 21. If Clarke met this initial burden of production, the burden shifted to the state to disprove any of the self-defense elements beyond a reasonable doubt. *Warth* at ¶ 29.

{¶23} To succeed on his self-defense claim, Clarke's belief that he faced imminent danger of death or great bodily harm had to be an honest belief, and objectively reasonable. *State v. Mitchell*, 2023-Ohio-2604, 222 N.E.3d 156, ¶ 24 (1st Dist.). And a defendant's "force must be reasonably proportionate to the threat." *In re J.S.,* 1st Dist. Hamilton Nos. C-230482, C-230483, C-230484, C-230485 and C-230486, 2024-Ohio-1764, ¶ 23; *see In re J.P.,* 1st Dist. Hamilton Nos. C-220647 and C-220648, 2023-Ohio-4816, ¶ 25; *see also State v. Terry,* 1st Dist. Hamilton No. C-220379, 2023-Ohio-2074, ¶ 15.

{¶24} It is hard to imagine a viable self-defense claim when the defendant continues using force after the victim appears to lose consciousness. We have rejected a defendant's self-defense claim, in part, because the defendant "continued to strangle [the victim] after [the victim] had been rendered unconscious." *State v. Griffin*, 175 Ohio App.3d 325, 2008-Ohio-702, 886 N.E.2d 921, ¶ 30 (1st Dist.). It is unreasonable to fear great bodily harm from a person lying motionless on the ground.

7

{¶25} Moreover, Ohio courts have held that "kicking an unconscious person in the head is excessive force." *State v. Johnson*, 6th Dist. Lucas No. L-08-1325, 2009-Ohio-3500, ¶ 13, citing *State v. Damron*, 4th Dist. Ross No. 06CA2903, 2007-Ohio-1187, ¶ 1. In *Johnson,* the defendant did not act in self-defense when witnesses testified that the victim "was punched ten times and kicked fifteen more times, all the while lying helpless and unconscious on the ground." *Id.* at ¶ 14. In *Damron,* the defendant was not acting in self-defense when, according to a witness, he kicked the victim who was "unconscious on the ground, not moving and not fighting back." *Damron* at ¶ 12. Recently, the Eighth District affirmed a conviction where "video evidence depicted [the victim] lying on the ground, defenseless and not taking any actions to defend herself as [the defendant] repeatedly hit her." *State v. Fadel*, 8th Dist. Cuyahoga No. 112725, 2024-Ohio-730, ¶ 42.

{¶26} Nothing in the surveillance footage suggests that the trial court lost its way when it rejected Clarke's self-defense claim. First, R.W. collapsed to the ground after the initial punch and appeared to lose consciousness. The footage shows Clarke kicking and stomping on R.W.'s head, taking a short break, and then resuming his attack. While Clarke testified that he acted out of fear because R.W. might get back up, Clarke was able to pause his attack and attempt a phone call. Assuming that Clarke did, in fact, hold a subjective belief that R.W. could retaliate, that R.W. was motionless on the floor as Clarke used his phone should have dispelled that belief. And like the defendants in *Johnson, Damron,* and *Fidel,* Clarke used excessive force.

{¶27} The trial court's findings, and ultimate rejection of Clarke's self-defense claim, are consistent with the weight of the evidence.

B. <u>There was a sufficient cooling-off period to dampen Clarke's passion and rage</u>

**{¶28}** Clarke also argues that "he acted in a sudden fit of rage," which makes him guilty of aggravated assault, a lesser included offense of felonious assault. A defendant can be found not guilty of the offense charged, "but guilty of an inferior degree thereof, or of a lesser included offense." Crim.R. 31(C); *see* R.C. 2945.74.

**{¶29}** The trial court convicted Clarke of felonious assault in violation of R.C. 2903.11(A)(1), which makes it a crime to "knowingly * * * cause serious physical harm to another." Unless the victim is a law enforcement officer, felonious assault is a second-degree felony. R.C. 2903.11(D)(1)(a).

**{¶30}** As an inferior offense, aggravated assault is a fourth-degree felony and identical to felonious assault, "except for the additional mitigating element of serious provocation." *State v. Ruppart*, 187 Ohio App.3d 192, 2010-Ohio-1574, 931 N.E.2d 627, ¶ 25 (8th Dist.), quoting *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988), paragraph four of the syllabus. Specifically, the offender must cause the physical harm "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force." R.C. 2903.12(A)(1). This "render[s] the provoked defendant less worthy of blame and subject to less punishment." *State v. Smith*, 168 Ohio App.3d 141, 2006-Ohio-3720, 858 N.E.2d 1222, ¶ 44 (1st Dist.). But "the defendant must react suddenly"—a provocation defense is not available when there is a sufficient cooling-off period. *Id.* at ¶ 48.

**{¶31}** What constitutes a serious provocation " 'is a factual inquiry that contains both objective and subjective components.' " *State v. Thompkins*, 1st Dist. Hamilton No. C-220307, 2023-Ohio-2603, ¶ 19, quoting *Smith* at ¶ 46. Beginning with

the objective component, a serious provocation is an event "intense enough to cause an ordinary person to lose control of their emotions, acting out of passion rather than reason." *Id.*, citing *Smith* at ¶ 46. When determining if a provocation was objectively reasonable, this court "does not consider the defendant's individual characteristics, such as short-temperedness." *Id.* In *Smith,* we explained that "[p]ast altercations and past verbal threats do not satisfy the test for sufficient provocation where there is sufficient time for cooling off." *Smith* at ¶ 48. Likewise, "[w]ords alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations." *Id.*

{¶32} Turning to the subjective component, this court must consider both the defendant's emotional and mental state and the circumstances surrounding the incident to determine whether the defendant acted under sudden passion or a fit of rage. *Id.* at ¶ 20. A defendant's "fear alone is insufficient to show that a defendant acted under a sudden passion or fit of rage." *State v. Rhymer*, 1st Dist. Hamilton No. C-200164, 2021-Ohio-2908, ¶ 34; *see Smith* at ¶ 48.

{¶33} Clarke argues that he attacked R.W. in response to R.W.'s initial unprovoked attack in the elevator and R.W.'s subsequent taunt 30 minutes later. Clarke argues that the provocation in this case is similar to the evidence of provocation in *Rhymer*. In *Rhymer,* this court held that an objectively serious provocation preceded James Rhymer's killing Thomas Landacre because

> Landacre was dating the mother of Rhymer's child and was a father
> figure to that child. * * * Landacre had previously threatened him with
> violence, had texted him a picture of his penis, had broken [the mother
> of Rhymer's child]'s car windows, and had tried to kill [Rhymer's child].

10

Landacre showed up to the custody exchange uninvited, extremely agitated, and under the influence of drugs. Rhymer testified that Landacre challenged him to a fight in front of [Rhymer's child], yelling, "There you are you, you are hiding from me, I found you, little pussy bitch, come on pussy bitch, let's do this right now, let's do this motherfucker." Furthermore, Rhymer testified that Landacre pushed him and tried to grab the firearm from him.

*Rhymer* at ¶ 32. While Clarke likens the facts of this case to *Rhymer,* the victim's statements in *Rhymer* were highly inflammatory and deeply personal, in contrast to R.W.'s alleged taunt of "what's up, motherfucker?"

**{¶34}** Plus, the trial court questioned whether R.W. made that remark. While Clarke testified that R.W.'s remark prompted him to attack R.W., the trial court explained, "I don't think there's enough time for him to say what's up, mother fucker, before you hit him. I don't think he could have said that. From the video I don't think there's enough time left for him to say that." And elsewhere, the trial court questioned the credibility of Clarke's testimony. It is well established that this court will presume in a bench trial, the trial court is in the best position to view the witnesses' manner and demeanor, account for inconsistencies, and determine witness credibility. *State v. Nettles*, 1st Dist. Hamilton No. C-180535, 2019-Ohio-3682, ¶ 17. The footage does not contradict or undermine the trial court's finding. And absent a taunt, the only fact supporting Clarke's provocation theory is the initial fight in the elevator. Ohio courts have routinely held that "past incidents * * * are not sufficient" to show a serious provocation. *State v. Mitchell,* 6th Dist. Lucas No. L22-1166, 2023-Ohio-3543, ¶ 53.

{**¶35**}  Finally, Ohio courts have held that "fifteen to twenty minutes after [a] fight" is a sufficient cooling-off period. *See State v. Maldonado*, 8th Dist. Cuyahoga No. 108907, 2021-Ohio-1724, ¶ 39; *see also State v. Patterson,* 10th Dist. Franklin No. 15AP-1117, 2016-Ohio-7130, ¶ 40 (collecting cases). The trial court appeared to find that Clarke had sufficient time to cool off after the first fight. Specifically, it explained that the first fight "couldn't have been that bad because [Clarke's friend] left you and a half hour goes by. So if you're still pissed off about being assaulted, you don't call the police. You don't look for the police. You stick around and go get some smokes." The trial court's findings are consistent with Ohio law.

{**¶36**}  As the trial court noted, something happened when Clarke first encountered R.W. in the elevator. We do not doubt that Clarke attacked R.W. in response. But 30 minutes had passed between that fight and Clarke's attack, which was a reasonably sufficient time for Clarke's passion to cool. We defer to the trial court's finding that R.W. did not challenge Clarke when he stepped off the elevator. We hold that the trial court did not lose its way when it found that Clarke was not acting in a sudden fit of rage when he attacked R.W.

{**¶37**}  Clarke's conviction is not against the manifest weight of the evidence. We overrule Clarke's first assignment of error.

### C.  Speculation does not establish ineffective assistance of counsel

{**¶38**}  In his second assignment of error, Clarke claims that his trial attorney was ineffective in violation of his right to counsel for failing to introduce expert testimony of his mental state. He argues that his self-defense claim and mitigation defense both implicate his mental state, and "[a]n expert could have interviewed

and/or tested Mr. Clarke for how he responds to stress and threats," which would have assisted the trial court in considering whether his response to R.W. was reasonable.

**{¶39}** To establish an ineffective-assistance-of-counsel claim, Clarke must show that his attorney's "performance was deficient and that the deficient performance prejudiced the accused." *State v. Davis*, 1st Dist. Hamilton No. C-190302, 2021-Ohio-1693, ¶ 65, quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prove that his attorney's performance was deficient, he must "show his lawyer's performance fell below an objective standard of reasonable representation." *State v. Quinones*, 8th Dist. Cuyahoga No. 94082, 2010-Ohio-5240, ¶ 25, citing *Strickland* at paragraph two of the syllabus. To show prejudice, he must demonstrate that "there is a reasonable probability that the outcome of the proceedings would have been different but for the complained-of conduct." *Davis* at ¶ 65, citing *Strickland* at 694.

**{¶40}** As Clarke points out, typically "the decision not to call an expert witness does not constitute ineffective assistance of counsel because that decision is solely a matter of trial strategy." *Davis* at ¶ 66, citing *State v. Coleman*, 45 Ohio St.3d 298, 307-308, 544 N.E.2d 622 (1989). Yet, Clarke argues that his attorney "failed to put on any expert evidence to establish Mr. Clarke's state of mind."

**{¶41}** Clarke offers little more than speculation about this expert testimony. And without more, he cannot establish prejudice because when " '[n]othing in the record indicates what kind of testimony an [expert witness] could have provided,' resolving the issue of whether counsel was deficient in failing to employ an expert is 'purely speculative.' " *Quinones* at ¶ 26, quoting *State v. Madrigal*, 87 Ohio St.3d 378, 390-91, 721 N.E.2d 52 (2000); *see State v. Powell,* 8th Dist. Cuyahoga No. 107276,

2020-Ohio-3387, ¶ 37; *see also State v. Long,* 12th Dist. Warren No. CA2021-02-014, 2021-Ohio-3651, ¶ 41; *City of Mansfield v. Studer*, 5th Dist. Richland Nos. 2011-CA-93 and 2011-CA-94, 2012-Ohio-4840, ¶ 65.

**{¶42}** Still more, we have held that speculative assertions about the substance of hypothetical expert testimony cannot establish prejudice. *See Davis*, 1st Dist. Hamilton No. C-190302, 2021-Ohio-1693, at ¶ 65. Clarke's arguments are ill-suited for an ineffective-assistance claim raised on direct appeal because there is no evidence in the record related to his mental state and he cannot offer anything more than mere speculation.

**{¶43}** Since mere speculation does not establish an ineffective-assistance claim, we overrule Clarke's second assignment of error.

### III.    Conclusion

**{¶44}** We overrule Clarke's assignments of error and affirm his conviction.

Judgment affirmed.

**BERGERON** and **KINSLEY, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.