# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO.   C-210608 |
| | | TRIAL NO.     B-1801231 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| JOSHUA MOUNTS, | : | |
| | | *JUDGMENT ENTRY* |
| Defendant-Appellant. | : | |

This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is reversed and the cause is remanded.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 4/22/2026 per order of the court.**


By:_____
      **Administrative Judge**

[Cite as *State v. Mounts*, 2026-Ohio-1443.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. | C-210608 |
| | | TRIAL NO. | B-1801231 |
| Plaintiff-Appellee, | : | | |
| vs. | : | | |
| | | *O P I N I O N* | |
| JOSHUA MOUNTS, | : | | |
| Defendant-Appellant. | : | | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: April 22, 2026

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Ronald W. Springman, Jr.,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Elizabeth R. Miller,* Ohio Public Defender, *Randall L. Porter*, *Kathryn L. Sandford*, and *Erika M. LaHote*, Assistant Public Defenders, for Defendant-Appellant.

**KINSLEY, Presiding Judge.**

{¶1} In this reopened appeal, defendant-appellant Joshua Mounts challenges his conviction for felony murder in connection with the death of his seven-month-old son, J.F. We initially affirmed the judgment of the trial court convicting Mounts of J.F.'s murder. *See State v. Mounts*, 2023-Ohio-3861 (1st Dist.). We held that Mounts's conviction was not against the manifest weight of the evidence, that Mounts's trial attorney failed to preserve any claim of error regarding the scope of expert testimony, that the State did not improperly present a lay witness as an expert witness, and that trial counsel waived all but plain error by failing to object to the prosecutor's comments during closing argument. *Id*. at ¶ 2. In doing so, we noted that Mounts had raised "limited assignments of error" on appeal. *Id*.

{¶2} We then permitted Mounts to reopen his appeal on the basis of ineffective assistance of appellate counsel and to raise new assignments of error that were omitted from his initial appeal. *See* App.R. 26(B). He now claims that defense counsel rendered ineffective assistance at trial in the two ways our initial opinion suggested—acquiescing to the State's objection to the scope of a defense expert's testimony and failing to object to improper comments by the prosecutor in closing argument. He also takes issue with trial counsel's failure to object to the testimony of an expert witness called by the State, as well as other alleged omissions and missteps. In addition, he argues that his original appellate attorney provided ineffective assistance on appeal for failing to assign trial counsel's ineffectiveness as error. We agree. Therefore, because our review of the record leads us to hold that Mounts received ineffective assistance from both his trial and appellate counsel, we vacate our prior opinion in his direct appeal, reverse the judgment of the trial court, and remand the cause for a new trial.

3

*Factual and Procedural History*

**{¶3}** On January 25, 2018, emergency medical services responded to a 9-1-1 call after J.F. was found unresponsive at Mounts's home. An ambulance transported J.F. to Cincinnati Children's Hospital, where he was diagnosed with a skull fracture and severe brain injuries. After doctors informed J.F.'s mother, Kayla, that he had no chance of recovery, she chose to remove him from life support. J.F. had solely been in Mounts's care the night before his death. The State accordingly charged Mounts with J.F.'s murder.[1]

**{¶4}** No eyewitness testified as to what precisely occurred to cause J.F.'s death. Thus, the evidence at trial largely advanced two competing theories about how J.F. died. On the one hand, the State contended that J.F. suffered blunt force trauma to the head during his overnight visit to Mounts's home that Mounts, as his sole caregiver during that period of time, must have perpetrated. On the other, Mounts argued that the injuries to J.F.'s brain were long-standing and could have been attributed to previous medical trauma, including both his mother's prenatal drug use and J.F.'s history of "Brief Resolved Unexplained Events" ("BRUE episodes") in which J.F. would stop breathing. Both sides relied heavily on expert testimony to support their competing theories.

**{¶5}** One of the few lay witnesses at trial was Kayla, J.F.'s mother. Kayla testified that J.F. lived with her, her grandparents, and J.F.'s half-brother, but that she was J.F.'s primary caretaker. According to Kayla, Mounts lived with his parents and brother but also saw J.F. at times.

---

[1] Mounts was charged with one count of aggravated murder in violation of R.C. 2903.01(C) and one count of felony murder in violation of R.C. 2903.02(B). The jury acquitted Mounts of aggravated murder but found him guilty of felony murder.

{¶6} Kayla admitted that she had previously used drugs. J.F.'s medical records indicated that he was born prematurely as a result of opiates in Kayla's system, but Kayla testified that she had stopped using as soon as she learned she was pregnant. Kayla agreed that J.F. had experienced at least one previous BRUE episode before his death, which caused him to stop breathing.[2] But she testified that he had not had an episode for months prior to becoming unresponsive in Mounts's care.

{¶7} When Kayla arrived at the hospital the day of the incident, she told hospital staff that J.F. had been experiencing cold symptoms but was otherwise well. According to Kayla, J.F. was a happy baby, despite having colic. His routine was to wake up between 8:00 and 9:00 a.m., although he had slept until late morning a few times when he was sick. Kayla denied ever dropping J.F. while he was in her care.

{¶8} Kayla testified that the day before J.F. became unresponsive, she and J.F. spent the evening with Mounts running errands. During that time, Mounts bought drugs. After they arrived back at Mounts's residence, she remembered that she had an appointment the next day, so she decided to leave J.F. with Mounts.[3] She fed J.F. a bottle and placed him in Mounts's bed. She did not notice anything unusual in J.F.'s behavior prior to leaving him overnight with Mounts.

{¶9} The next morning, Kayla received a message from Mounts's mother indicating that there was a medical emergency and that J.F. was not breathing. J.F. was transported to Cincinnati Children's Hospital where he was treated for a skull fracture. When Kayla spoke with Mounts, he denied that J.F. had fallen out of bed.

{¶10} First responders to the scene also testified at trial, both as to their

---

[2] J.F.'s medical records indicate that he had suffered from several BRUE episodes.
[3] Contrary to this testimony, Kayla told medical staff at the hospital that she left J.F. with Mounts because she "needed a break."

activities and as to Mounts's description of what happened. Per these witnesses, Mounts reported J.F. had slept through the night and woke up crying late the next morning around 11:00 a.m. Mounts said he found J.F. unresponsive after he went to prepare a bottle. One first responder testified to finding a warm bottle in Mounts's bedroom, which was consistent with Mounts's statement. But he also found a device commonly used for smoking marijuana. The bed had also been pushed against the wall, and a pillow had been placed on the other side as if to prevent J.F. from falling off.

{¶11} Detective Brad Hondorf, the lead detective in the investigation of J.F.'s death, also testified at trial. Hondorf reviewed a report another officer gave him from Cincinnati Children's Hospital which noted "suspected child abuse" in J.F.'s case. He accordingly focused his investigation on Mounts.

{¶12} Hondorf conducted four lay interviews as part of his investigation: Kayla, Mounts, and each of Mounts's parents. Mounts's father told Hondorf that J.F. appeared to have a "deer in the headlights" look the night before he was found unresponsive. Although Hondorf consulted with the doctor who performed the autopsy, the information regarding J.F.'s vacant look was never communicated at any point. Hondorf also attended a meeting of the physician team who evaluated J.F. at the hospital. The meeting occurred a few days following J.F.'s death. According to Hondorf, the physician team was unsure why J.F. stopped breathing on his own, despite the fact that he exhibited a skull fracture. They indicated that the cause could have been "child abuse, accidental, or genetic."

{¶13} One member of the team Hondorf remembered seeing at the meeting was Dr. Kathi Makoroff. Dr. Makoroff was a physician at Cincinnati Children's Hospital associated with the Mayerson Center for Safe and Healthy Children. The

record does not contain a report of Dr. Makoroff's opinions about the case, although it does contain her curriculum vitae, which was admitted as an exhibit at trial. Even though she had not submitted an expert report, Dr. Makoroff was permitted to testify for the State as an expert in child-abuse pediatrics without objection from the defense.

**{¶14}** Dr. Makoroff began her testimony by describing the function of the Mayerson Center. The Mayerson Center consults in cases of suspected child abuse. In that capacity, she was asked to evaluate J.F. while he was in the hospital. J.F. presented to the hospital with a skull fracture and subdural bleeding, types of injuries that Dr. Makoroff explained do not occur spontaneously.[4] According to Dr. Makoroff, J.F.'s injuries indicated that he suffered trauma. When asked if "the Mayerson Center came to a conclusion about whether or not this case constituted child abuse," Dr. Makoroff respond, "We did, yes." She testified that in her expert opinion J.F.'s injuries were consistent with child physical abuse. Without an objection from the defense, she also opined that J.F.'s injuries did not predate his overnight stay with Mounts. She explained that, in her expert opinion, a child would not behave normally after sustaining the types of injuries J.F. had.

**{¶15}** On cross-examination, Dr. Makoroff conceded that J.F. did not have bruising on his body when she evaluated him in the hospital. She did not recall whether Hondorf was at the team meeting that occurred two days after J.F.'s death, whether the team discussed J.F.'s case, or whether the Mayerson Center team developed an explanation for why J.F. stopped breathing. She admitted that the team did not keep notes from its weekly patient meetings.

**{¶16}** Dr. Dorothy Dean, a forensic pathologist at the Hamilton County

---

[4] J.F.'s injuries were documented by his medical records, which were admitted into evidence during Dr. Makoroff's testimony.

Coroner's Office, performed J.F.'s autopsy. She testified at trial as an expert in forensic pathology, and her autopsy report was admitted into evidence. Dr. Dean testified that J.F. had a fracture of the parietal bone, as well as a small bruise above his right eye, a bruise over the skull fracture, and four small bruises on his back. She also testified that there was fresh blood, referring to a subdural hematoma, near the fracture site and that there was no evidence of healing, which indicated that this was a very recent injury. According to Dr. Dean, J.F.'s skull fell apart in her hands when she made cuts, which indicated that the bone had not yet formed the fibrous tissue that cells generate in the process of healing a new fracture. Thus, when looking at the fracture microscopically, she saw a fresh fracture without evidence of healing. Accordingly, Dr. Dean did not believe J.F.'s previous BRUE episodes played a role in his death. Rather, it was her opinion that J.F. had likely died from a traumatic brain injury with a skull fracture due to blunt impacts to his head.

{¶17} In addition to establishing what she believed was the cause of death, a central component of Dr. Dean's testimony was her role in creating histological slides of J.F.'s brain. Other experts examined the slides to form their own opinions about the type of fracture J.F. suffered and its stage of healing. Dr. Dean testified that she provided Mounts's expert witnesses with "recut" slides, rather than the originals, but that the experts could have come to her office to view the originals in person. She also dispelled any notion that the recut slides were less reliable than the originals. She testified that if there had been any substantial difference between the originals and the recuts, she would have informed Mounts's expert witnesses. Finally, she explained that, according to her report, the recut slides of the fracture included "[a] section through one limb of the displaced fracture of the skull that includes the lambdoid suture . . . ." She testified that a suture is fibrous material holding the bone plates of

an infant's skull together and eventually hardens after the brain has reached its full size.

{¶18} Dr. Andrea Wiens, Dr. Satish Chundru, and Dr. Andrew Guajardo testified as expert witnesses for Mounts, and their expert reports were admitted into evidence. As to J.F.'s cause of death, they agreed that the blood near the fracture site they identified was not fresh and that J.F.'s skull exhibited evidence of healing, including new bone formation, which indicated that J.F.'s injuries were not recent. Dr. Wiens also testified that J.F.'s repeated BRUE episodes created a greater likelihood that underlying but unidentified etiology explained his death.

{¶19} As one of only 50 experts board certified in both forensic pathology and neuropathology, Dr. Wiens had initially been hired by the State to evaluate J.F.'s skull injury and review Dr. Dean's autopsy report. But when Dr. Wiens sent her report to the State, which disagreed with Dr. Dean's conclusion that the injuries were recent, the prosecutor informed her in a phone call that she had incorrectly identified the fracture site on the slide because she had not reviewed the original slide.

{¶20} Dr. Wiens attempted to clear up the confusion as to the basis for her testimony about the fracture after a break in her testimony. She began to do so by indicating that she had reviewed the original histology slide containing the fracture during the break, which had been admitted into evidence during Dr. Dean's testimony. But Dr. Wiens's expert report only concerned the recut slide, not the original slide she reviewed midtrial, so the State objected to her testifying to information outside of her report.

{¶21} The trial court conducted a sidebar to discuss the State's objection. At the sidebar, Mounts's counsel proffered that Dr. Wiens would testify as to the difference between the original slide and the recut slide. According to Mounts's

counsel, the difference in the slides would not alter Dr. Wiens's opinion that J.F.'s injuries were not recent, and, if permitted to testify, she would explain that, despite the prosecutor's concern on the phone call, she had correctly identified the fracture site.

{¶22} Given these representations from defense counsel, the trial court broached the topic of having Dr. Wiens amend her expert report. At that point, the trial court had not yet ruled on the State's objection to Dr. Wiens's intended testimony and had not excluded her explanation about the differing slides. But rather than agree to the trial court's proposed solution, and without responding directly to the State's objection, Mounts's counsel instead said he would move on from this line of questioning. He therefore abandoned the attempt to have Dr. Wiens clarify that she had in fact reviewed the original histology slide and reached the same conclusion about J.F.'s cause of death. Only then did the trial court sustain the State's objection.

{¶23} Dr. Chundru testified that he was shocked by Dr. Dean's diagnosis of J.F. because it was clear that J.F.'s injuries predated the incident at Mounts's home. Dr. Guajardo testified that J.F.'s injuries were a minimum of three weeks or older at the time of his death.

{¶24} On rebuttal, the State played the deposition of Dr. Rebecca Folkerth, a neuropathologist, and called Dr. Karen Looman, Chief Deputy Coroner at the Hamilton County Coroner's Office, to testify. Both essentially testified that they agreed with Dr. Dean's conclusions except Dr. Looman testified that the subdural hematoma appeared to be an older injury than the skull fracture. Finally, Dr. Dean

testified again on rebuttal, emphasizing that she was still confident in her findings.[5] She accused the three defense experts of misidentifying the fracture site as the lambdoid suture on the histology slide.

{¶25} The jury found Mounts guilty of felony murder but acquitted him of aggravated murder. He was sentenced to an aggregate sentence of 15 years to life in prison.

{¶26} In his initial appeal, Mounts raised four assignments of error, all of which we overruled. *See Mounts*, 2023-Ohio-3861, at ¶ 1 (1st Dist.). His first assignment of error was that his conviction was against the manifest weight of the evidence. *Id.* His second assignment of error challenged the trial court's decision to prevent Dr. Wiens from testifying about her review of the original histology slide because this information was not in her expert report. *Id.* at ¶ 31. His third assignment of error alleged that the trial court improperly admitted the observations of first responders about Mounts's behavior. *Id.* at ¶ 37. And his fourth assignment challenged the propriety of comments made by the prosecutor in closing argument. *Id.* at ¶ 45.

{¶27} None of these assignments of error took issue with the performance of his trial counsel. *Id.* at ¶ 1. Thus, Mounts moved to reopen his appeal pursuant to App.R. 26(B) on the basis that his appellate attorney had been ineffective on appeal by failing to raise the ineffective assistance of his trial counsel as an assignment of error. We granted this relief and ordered the parties to file additional briefs addressing this specific assignment of error and any others Mounts wished to pursue.

---

[5] Dr. Dean's rebuttal testimony was based on a separate expert report.

**{¶28}** Mounts then filed a brief in the reopened appeal that advanced three new assignments of error, but not the argument that his original appellate counsel had rendered ineffective assistance of counsel. Following the Ohio Supreme Court's decision in *State v. Clark*, 2025-Ohio-4410, he moved to submit a supplemental brief for the purpose of including the ineffective-assistance-of-appellate-counsel issue he had initially omitted.[6] We granted that motion, and Mounts filed a supplemental brief including that additional assignment of error.

**{¶29}** We now address Mounts's reopened appeal.

### *Reopened Appeal*

**{¶30}** In his principal and supplemental briefs, Mounts raises four new assignments of error for our review: (1) Mounts's trial counsel provided ineffective assistance at trial; (2) the trial court erred by excusing for cause all prospective jurors who had not been vaccinated against Covid-19; (3) Mounts's due process rights were violated by the State's presentation of "fundamentally unreliable testimony"; and (4) Mounts's appellate counsel provided ineffective assistance. As they are dispositive of this reopened appeal, we address the ineffective-assistance-of-counsel claims first.

**{¶31}** In reviewing Mounts's ineffective-assistance claims, we are conscious of App.R. 26(B)(9), which governs reopened appeals. That rule provides that

> If the court finds that the performance of appellate counsel was deficient

---

[6] Mounts's initial brief in the reopened appeal did not assert an assignment of error advancing the argument that his appellate counsel was ineffective. This was despite the fact that his App.R. 26(B) motion to reopen the appeal indicated that he wanted to raise this particular issue, and despite our order clearly instructing Mounts to raise it. After initial briefing was complete in the reopened appeal, Mounts filed a motion to submit a supplemental brief so that he could raise ineffective assistance of appellate counsel in accordance with *Clark*, 2025-Ohio-4410, at ¶ 3, which requires an appellate court to find ineffective assistance of appellate counsel to grant relief in a reopened appeal. The concurrence in *Clark* suggests that a defendant may raise ineffective assistance of appellate counsel in a reopened appeal in a supplemental brief. *See Clark* at ¶ 28 (Hawkins, J., concurring). And, notably, the State did not object to Mounts's request to supplement his brief.

and the applicant was prejudiced by that deficiency, the court shall vacate its prior judgment and enter the appropriate judgment. If the court does not so find, the court shall issue an order confirming its prior judgment.

**{¶32}** Because App.R. 26(B)(9) focuses on the performance of appellate counsel, we may vacate our prior judgment and grant Mounts relief only if the performance of his appellate attorney was prejudicially deficient. *See State v. Stultz*, 2023-Ohio-4754, ¶ 2 (9th Dist.). We therefore consider Mounts's claim that his trial counsel rendered ineffective assistance of counsel for the purpose of determining whether his appellate attorney was ineffective in failing to raise it on appeal.

### A. Ineffective Assistance of Trial Counsel

**{¶33}** In his first assignment of error, Mounts argues that his trial counsel rendered ineffective assistance. To establish ineffective assistance of counsel, a defendant must demonstrate both that (1) counsel's performance was deficient, and (2) counsel's deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989).

**{¶34}** Counsel's performance is deficient if it falls below an objective standard of reasonableness. *State v. Payne*, 2019-Ohio-848, ¶ 8 (1st Dist.). Counsel is presumed to have provided adequate assistance. *State v. Smith*, 17 Ohio St.3d 98, 100 (1985). Consequently, to demonstrate deficient performance, a defendant must overcome the presumption that trial counsel's challenged action "might be considered sound trial strategy." *Id.*

**{¶35}** To demonstrate prejudice, appellant must show that there is "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Bradley* at 146. "A reasonable probability is

13

a probability sufficient to undermine confidence in the outcome." *Id.*, quoting *Strickland* at 694. Prejudice may result from the cumulative effect of trial counsel's errors. *State v. Gondor*, 2006-Ohio-6679, ¶ 72. In considering the impact of an attorney's mistakes, "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture." *Id.*, citing *Strickland* at 694-695. But errors cannot become prejudicial simply because of their sheer number. *State v. Hill*, 75 Ohio St.3d 195, 212 (1996).

### 1. *Deficient Performance*

**{¶36}** Mounts points to many instances of alleged deficient performance by trial counsel throughout his case. We focus on three—trial counsel's acquiescence in the State's objection to Dr. Wiens's testimony about her review of the original fracture slide, trial counsel's failure to object to Dr. Makoroff's testimony in light of the fact that she did not disclose an expert report, and trial counsel's failure to object to a statement by the prosecutor in closing argument that eight additional doctors could have been called to testify that J.F.'s injuries were recent and caused by child abuse.

### a. *Dr. Wiens*

**{¶37}** First, Mounts argues that trial counsel performed deficiently by acquiescing to the State's objection to Dr. Wiens's testimony about the original histology slide rather than taking advantage of the trial court's offer to have Dr. Wiens amend her expert report. We agree that this decision fell below the objective standard of reasonableness for a defense attorney and therefore constituted deficient performance.

**{¶38}** The decision to call a particular expert witness is typically strategic, and an attorney does not perform deficiently by failing to present expert testimony. *See State v. Clarke*, 2024-Ohio-2921, ¶ 40 (1st Dist.). But Mounts does not challenge his

attorney's decision to put an expert on the stand. Rather, he questions his attorney's failure to rehabilitate a central point in Dr. Wiens's testimony that the State then used to undermine her credibility with the jury. Where the State's case involves evidence the jury cannot properly understand without the assistance of experts, the failure to engage a competent expert can constitute deficient performance. *Hinton v. Alabama*, 571 U.S. 263, 273 (2014). So too can the failure to present an expert be deficient when the crux of a defendant's defense turns on evidence that cannot be properly provided to a jury without the use of expert testimony. *See State v. Herring*, 2014-Ohio-5228, ¶ 73-79, 80.

{**¶39**} A critical issue in Mounts's trial was the timing of when J.F. incurred the skull fracture and subdural hematoma—a question that all experts agreed could be determined only through microscopic examination of the histology slides of J.F.'s brain. As she explained in her expert report, Dr. Wiens formed her opinion that J.F.'s skull exhibited new bone formation indicative of healing, and therefore, an older injury by reviewing a recut slide supplied by Dr. Dean. This conclusion caused her services to be terminated by the State, because the prosecution believed she had reviewed the wrong section of the slide and had therefore misidentified the fracture in J.F.'s skull. Defense counsel was well aware that the State would critique Dr. Wiens's methodology in this way, thereby attempting to undermine her credibility, because she relayed the nature of her phone call with the prosecutor in her expert report. And at the very least, defense counsel became aware of the issue when Dr. Wiens herself testified to the prosecutor's phone call during direct examination.

{**¶40**} The record reflects that the trial court ordered a lunch break shortly after Dr. Wiens testified about her call with the prosecutor concerning the recut slide. Defense counsel appeared to understand the gravity of that testimony, because upon

return from lunch, he immediately asked Dr. Wiens questions to rehabilitate her conclusion about the location of the fracture on the recut histology slide. To that end, Dr. Wiens explained that she had reviewed the original histology slide, which she had not seen before, during lunch. This is what prompted the State's objection, because Dr. Wiens did not disclose her opinion of the original slide in her expert report. Responding to that objection, defense counsel again appeared to appreciate the importance of Dr. Wiens's testimony, because he proffered at sidebar that her review of the original slide had not changed her opinion about J.F.'s injuries. It was not until the trial court suggested that defense counsel amend Dr. Wiens's report to include the information she gleaned from viewing the original slide that defense counsel indicated he would abandon the entire line of questioning.

**{¶41}** This exchange strongly suggests that defense counsel's actions were the product of something other than "sound trial strategy." *See Smith*, 17 Ohio St.3d at 100. Rather, it appears that, after initially mounting a robust proffer of Dr. Wiens's intended testimony, defense counsel inexplicably retreated from having Dr. Wiens clarify her methodology and opinions in court to avoid having to produce an amended expert report. Had it been defense counsel's plan to deemphasize the role of the recut slides in Dr. Wiens's report, we question why he would have asked Dr. Wiens to testify about this very thing upon returning to court after lunch. We also question why trial counsel would have proffered Dr. Wiens's testimony if he felt that it was strategically unhelpful to Mounts. Indeed, nothing in defense counsel's approach leading up to his decision to abandon Dr. Wiens's testimony about the original slide suggests that it was a strategic one.

**{¶42}** But even if it was, the decision of Mounts's attorney to acquiesce in the State's objection was not strategically reasonable. Defense counsel knew when he

abandoned the line of questioning about the slides that the State would question Dr. Wiens's credibility on the basis that she had misidentified the fracture in the recut slide. Because the entire case rested on which cause-of-death theory the jury found more believable—that Mounts caused a blunt force head injury to J.F. or that J.F. had preexisting brain injuries that manifested in his loss of consciousness—Dr. Wiens's credibility was critical to Mounts's defense. It was theoretically possible for another witness to testify as to the difference between the original and recut slides and whether they provided the same view of the fracture in J.F.'s brain. In fact, Dr. Dean herself had explained that there were no significant differences between the original and recut slides. But the only person who could testify that Dr. Wiens had in fact reviewed the original slide and that it had not altered her opinion that the fracture in J.F.'s skull was preexisting was Dr. Wiens.

**{¶43}** In *State v. Bunch*, 2022-Ohio-4723, ¶ 34, 47, the Ohio Supreme Court noted that the lack of alternative sources for an expert's opinion can be a factor in considering whether an attorney's decision to forego expert testimony is strategically reasonable. It is certainly a factor here. Given the importance of Dr. Wiens's opinion to Mounts's defense, and the fact that she was the only person who could explain her methodology, defense counsel's performance in abandoning her testimony about the original slides fell below an objective standard of reasonableness.

### b. Dr. Makoroff

**{¶44}** Mounts next argues that his trial counsel rendered deficient performance in failing to object to Dr. Makoroff's expert testimony when she did not submit an expert report. We agree. Crim.R. 16(K) requires an expert witness to prepare a written report summarizing the expert's testimony, findings, analysis, conclusions, or opinion and the expert's qualifications. The purpose of this rule is to

strengthen the right to a fair trial and to prevent unfair surprise by giving notice to the defendant, so he has an opportunity to challenge the expert's findings or qualifications. *State v. Boaston*, 2020-Ohio-1061, ¶ 44. An expert may generally not testify at trial if the expert's written report was not disclosed to opposing counsel. *Id.* at ¶ 65. However, where an expert is a treating physician, some courts have found the report requirement satisfied by the disclosure of discovery documents, like medical records, that contain the substance of the expert's testimony. *See, e.g., State v. Martin*, 2024-Ohio-5332, ¶ 81 (7th Dist.); *State v. Heller*, 2019-Ohio-4722, ¶ 8 (9th Dist.).

**{¶45}** A treating physician may also testify as a fact witness without being qualified as an expert. *See, e.g., Henry v. Richardson*, 2011-Ohio-2098, ¶ 33 (12th Dist.) (holding that treating physician's testimony about patient's symptoms, treatment, and health care costs was nonexpert testimony). In these instances, Crim.R. 16(K) does not apply. *State v. Fetty*, 2012-Ohio-6127, ¶ 41 (11th Dist.).

**{¶46}** Thus, the threshold question with regard to Dr. Makoroff was whether she testified as a treating physician or as an expert. In resolving this critical question, we emphasize that the State expressly qualified Dr. Makoroff as an expert in child abuse. While she provided some information about her examination of J.F. and the injuries she observed, the crux of her testimony resounded in the kinds of opinions only experts tend to offer. For example, Dr. Makoroff testified that J.F. was the victim of intentional trauma and that he had not sustained the fatal injuries to his brain prior to his overnight visit with Mounts. She also opined that a child with the type of injuries J.F. suffered would not have presented normally, thus supporting her conclusion that he had not been harmed before spending the night with Mounts. These opinions went beyond describing Dr. Makoroff's observations about J.F.'s condition and the

18

treatment she provided. Rather, Dr. Makoroff formed conclusions, based on her expertise, about what happened to J.F. She therefore testified as an expert who was required to comply with Crim.R. 16(K).

**{¶47}** The record reflects, however, that Dr. Makoroff did not disclose an expert report as required by that rule. To be clear, there is no direct evidence that affirmatively documents this conclusion. No witness expressly indicated that Dr. Makoroff failed to submit a report, and no exhibit directly states this either. This absence, however, is not dispositive, as the circumstantial evidence overwhelmingly permits the inference that no expert report was disclosed.

**{¶48}** For one thing, Dr. Makoroff's report was not listed on the State's response to Mounts's demand for discovery, even though the State identified and disclosed Dr. Dean's report and the report of a social worker. Dr. Makoroff was not even disclosed as a State's witness in this document. For another thing, the State twice filed a "Certificate of Necessity for Expert Witness"—one for Dr. Wiens and one for Dr. Folkerth—but it never filed such a certificate for Dr. Makoroff. This omission, like the one in the State's discovery response, further highlights the lack of disclosure about Dr. Makoroff.[7] To the extent that her report might have been disclosed to defense counsel but not docketed in the record, defense counsel's closing argument dispelled that notion. In closing, defense counsel described each of the State's expert disclosures for the jury, naming each expert and the date that the expert's report was submitted. Conspicuously, counsel identified no such date for Dr. Makoroff. This omission is telling. In the context of an otherwise complete accounting, it reflects that Dr.

---

[7] The record does indicate that the State attempted to serve a subpoena on a "Kathy Makoroll, M.D.," but that subpoena was never endorsed and returned. Even if the defense knew Dr. Makoroff might be called as a witness, the defense was not alerted that she was going to offer an expert opinion until she did so at trial.

Makoroff did not furnish an expert report. Nor do J.F.'s medical records provide a substitute, as the records did not contain Dr. Makoroff's opinion that J.F.'s injuries resulted from intentional trauma.[8]

**{¶49}** The records were also silent as to Dr. Makoroff's opinion that J.F.'s injuries could not predate his visit to Mounts's home. While the medical records noted an acute fracture, Dr. Makoroff conceded on cross-examination that the age of a fracture could not be determined through radiology alone.

**{¶50}** Under these circumstances, the substance of Dr. Makoroff's expert opinions was not adequately disclosed through the medical records, and her testimony exceeded the permissible scope of a treating physician's undisclosed opinions. *See Boaston*, 2020-Ohio-1061, at ¶ 1, 55. Counsel's failure to object to this testimony, which introduced a previously-undisclosed expert opinion on a central issue in the case, fell below an objective standard of reasonable representation and therefore constituted deficient performance.

### c. *Closing Arguments*

**{¶51}** Lastly, Mounts argues that his trial counsel was deficient for failing to object to improper comments during the State's closing argument. Specifically, Mounts challenges the following statement made by the prosecutor:

But this case isn't just a case built on the testimony of Dr. Dean, Dr. Looman, and Dr. Folkerth, because they're not the only doctors who came to the conclusion that J.F. was killed by child abuse by blunt force trauma and sustained the injuries that he sustained and that it was a

---

[8] Notably, Hondorf testified that the medical team could not identify why J.F. stopped breathing at their meeting two days after his death. According to Hondorf, they considered whether his injuries were the result of abuse, genetics, or an accident, but did not determine a definitive cause. J.F.'s medical records were therefore ambiguous as to his cause of death, whereas Dr. Makoroff expressed a single cause—child abuse.

recent episode.

**{¶52}** The prosecutor then identified eight additional doctors by name whom the State could have called as witnesses and asserted that they would have offered testimony consistent with the State's experts. The prosecutor said they were not called only to avoid prolonging the trial.

**{¶53}** "The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether the remarks prejudicially affected the accused's substantial rights." *State v. Dean*, 2015-Ohio-4347, ¶ 238. Prosecutors are generally afforded significant latitude in closing arguments. *State v. Ballew*, 76 Ohio St.3d 244, 255 (1996). Nonetheless, "[a] prosecutor cannot express his personal belief or opinion as to the credibility of a witness or as to the guilt of the accused or *go beyond the evidence that is before the jury* when arguing for a conviction." (Emphasis added.) *State v. Gilbert*, 2011-Ohio-4340, ¶ 46 (12th Dist.). In fact, a prosecutor has a duty to avoid efforts to obtain a conviction that exceeds the evidence presented at trial. *State v. Pino*, 2008-Ohio-3578, ¶ 53 (6th Dist.).

**{¶54}** Contrary to this principle, the prosecutor told the jury what eight additional expert witnesses would supposedly have said if they would have been called to testify. No evidence presented at trial supported this conclusion. This was improper. *See id.* at ¶ 54, 57.

**{¶55}** Where a prosecutor engages in prosecutorial misconduct in closing argument, an objectively reasonable defense attorney should object. *See State v. Junod*, 2019-Ohio-743, ¶ 54 (3d Dist.) (finding deficient performance where defense counsel failed to object to prolonged biblical references in State's closing argument). But here, trial counsel failed to object to the prosecutor's improper insinuation that eight additional doctors would testify that J.F. suffered child abuse and that the injury

was recent. This constituted deficient performance that fell below an objective standard of reasonable representation.

### B. Prejudice

**{¶56}** We have determined that Mounts's trial counsel performed deficiently in three ways—in abandoning Dr. Wiens's testimony about the original histology slides, in failing to object to Dr. Makoroff's expert testimony given the absence of her expert report, and in failing to object to the prosecutor's improper closing argument. We accordingly consider whether the cumulative effect of these mistakes undermined confidence in the outcome of Mounts's trial.[9] *See Gondor*, 2006-Ohio-6679, at ¶ 72.

**{¶57}** The State's case rested largely on expert testimony asserting that J.F.'s skull fracture was recent, thereby supporting the inference that the fatal injury occurred while J.F. was in Mounts's care. Yet there was no direct evidence linking Mounts to the alleged abuse. As a result, this was quite simply a battle of the experts. Whichever set of experts the jury found more credible and believable was likely to prevail. This meant that any significant error or omission by defense counsel in his presentation of J.F.'s medical information to the jury had the potential to tip the scales against Mounts.

**{¶58}** And we believe they did in this case. Collectively and individually, defense counsel's mistakes allowed the jury to hear unchallenged or improper testimony while limiting the defense's ability to present a complete and responsive

---

[9] The State argues this court's prior plain-error review of the prosecutor's comment concerning the testimony of other experts that did not testify at trial applies equally to the prejudice inquiry here. But the prior appeal addressed the impact of a single error. *See Mounts*, 2023-Ohio-3861, at ¶ 57-59 (1st Dist.). In contrast, the present ineffective-assistance claim requires consideration of multiple instances of deficient performance, which we evaluate collectively in assessing prejudice. *See Bradley*, 42 Ohio St.3d at 146-147, quoting *Strickland*, 466 U.S. at 694.

expert opinion.[10]

**{¶59}** With respect to Dr. Wiens specifically, the jury heard the State accuse her of misidentifying the fracture site on the recut slide and suggest that she had not reviewed the original slide—which the State implied showed no healing. But the jury never heard that Dr. Wiens did review the original slide and did not change her opinion after doing so. This omission undercut a key defense position: that J.F.'s brain injuries predated his time with Mounts. While other experts—Dr. Chundru and Dr. Guajardo—testified consistently with Dr. Wiens, her opinion was critical to Mounts's defense because she alone reviewed the original histology slide and had previously been retained by the State. The State's attack on her credibility rested mainly on the assumption that she had not examined the original material. Preventing her from clarifying this left the jury with a misleading impression.

**{¶60}** The jury also heard damaging testimony from Dr. Makoroff that could have been subject to exclusion or, at the very least, a continuance to avoid the surprise of her expert opinions at trial.[11] Despite the fact that Dr. Makoroff had not disclosed an expert report of any kind, she was permitted to opine that J.F.'s injuries were consistent with child abuse and did not predate his time with Mounts, opinions that far exceeded facts she could have testified to as a treatment provider.[12]

---

[10] The jury's split verdict undermines any claim that counsel's deficient performance caused no prejudice. Instead, the jury's mixed findings show that the jury accepted the undisclosed expert testimony that J.F.'s injuries resulted from intentional trauma rather than accident and were recent, but disagreed about Mounts's level of intent. The jury did not conclude that Mounts intended to kill J.F.; rather, it found that Mounts knew the abuse was likely to cause serious harm.

[11] We recognize that if defense counsel had objected the State could have sought a continuance and perhaps provided an expert report. *See* Crim.R. 16(L)(1) (permitting a continuance as a remedy for a discovery violation); *but see State v. Bellamy*, 2022-Ohio-3698, ¶ 12 (holding that a continuance is not possible midtrial to remedy the nondisclosure of a required expert report). However, the question before us is not whether the State could have cured the violation, but whether the admission of Dr. Makoroff's undisclosed expert opinion, as it actually occurred at trial, was improper and undermined confidence in the verdict.

[12] Nothing prohibited Dr. Makoroff from testifying to her personal examination of J.F. from the

**{¶61}** This testimony was neither harmless nor cumulative. Dr. Dean's findings—"blunt force trauma" and a homicide classification—did not, by themselves, establish intentional injury. Dr. Makoroff supplied the missing inference. She was the only expert to equate blunt force trauma with child abuse, converting an otherwise ambiguous medical finding into an assertion of intentional, rather than accidental, harm. And she did so without prior disclosure, depriving the defense of any meaningful opportunity to prepare, investigate, or rebut that opinion given that J.F.'s medical records did not contain such a conclusion.

**{¶62}** Without this undisclosed testimony, the jury could have reasonably viewed the medical evidence differently, including the possibility of accidental injury or another etiology, as Dr. Wiens suggested. Allowing such an undisclosed opinion on a central issue undermines confidence in the verdict.[13]

**{¶63}** Finally, we turn to counsel's failure to object to the prosecutor's closing argument. In a case turning on expert credibility, the State's suggestion that eight additional doctors—none of whom testified—would have supported its theory of the case dramatically altered the perceived balance of expert opinion. By effectively inflating the State's expert count from three to 11, the prosecutor invited the jury to rely on evidence not in the record. In the absence of an objection, these comments could only have influenced the jury's assessment, further undermining confidence in the outcome.

---

perspective of a treating physician. *See Henry*, 2011-Ohio-2098, at ¶ 33 (12th Dist.). In determining the prejudicial impact of Dr. Makoroff's testimony, we solely consider the improper expert opinions she offered, not her first-hand observations of J.F.'s physical condition.

[13] Dr. Makoroff's expert testimony should have not been permitted, and, as we explain in this opinion, appellate counsel's failure to raise ineffective assistance of trial counsel as to this issue constitutes reversible error. *See Boaston*, 2020-Ohio-1061, at ¶ 1. But the mere fact that the State did not disclose Dr. Makoroff's report at Mounts's first trial does not preclude her from testifying at any subsequent retrial. *See Bellamy*, 2022-Ohio-3698, at ¶ 11-13. Provided the State complies with Crim.R. 16(K) in the future, nothing prohibits Dr. Makoroff from testifying in the future.

**{¶64}** Even if each deficiency could not support a finding of prejudice on its own, taken together, counsel's errors deprived Mounts of the effective assistance of trial counsel. Each deficiency—the failure to present Dr. Wiens's full and accurate opinion, the admission of undisclosed and highly consequential expert testimony from Dr. Makoroff, and the failure to object to the prosecutor's improper closing argument— occurred in a case that turned entirely on expert credibility. In that context, even small missteps carried outsized weight. Here, the errors did not merely accumulate; they compounded one another, allowing the jury to hear misleading or undisclosed expert opinions while preventing the defense from fully presenting the only defense expert who reviewed the original histology slide.

**{¶65}** Under these circumstances, there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.

**{¶66}** The first assignment of error in Mounts's reopened appeal is sustained.

### C. *Ineffective Assistance of Appellate Counsel*

**{¶67}** In his fourth assignment of error, Mounts argues that his original appellate attorney was constitutionally ineffective when he failed to raise the issue of trial counsel's effectiveness in his initial appeal. He additionally contends that his appellate attorney should have raised two of his original assignments of error—the one challenging the admissibility of Dr. Wiens's testimony as to the original slides and the one challenging improper comments by the prosecutor in closing arguments—as bases for ineffective assistance of trial counsel.

**{¶68}** To prove ineffective assistance of appellate counsel, Mounts bears the burden of demonstrating that "prejudicial errors were made in the trial court and that ineffective assistance of appellate counsel in the prior appellate proceedings prevented

these errors from being presented effectively to the court of appeals." *State v. Leyh*, 2022-Ohio-292, ¶ 22, quoting 1993 Staff Notes to App.R. 26(B). Thus, our prior judgment may not be changed unless Mounts shows "that the direct appeal was meritorious and failed because appellate counsel rendered ineffective assistance under the two-prong *Strickland* standard." *Id.* at ¶ 24.

{¶69} We have already determined that Mounts received ineffective assistance from trial counsel. Thus, the failure of Mounts's original appellate counsel to raise the issue was both deficient and prejudicial. Had Mounts raised ineffective assistance of counsel in his initial appeal, we would have sustained this assignment of error, as we do now, and Mounts's conviction would have been reversed. We accordingly hold that Mounts was deprived of his constitutional right to the effective assistance of appellate counsel. Mounts's fourth assignment of error is sustained.

### D. Remaining Assignments of Error

{¶70} Given our disposition of Mounts's first and fourth assignments of error, his second and third assignments of error are moot, and we do not address them. The assignments of error raised in Mounts's initial appeal are also moot.

### Conclusion

{¶71} Having determined that Mounts's constitutional right to the effective assistance of counsel both at trial and on appeal was violated, we vacate our prior judgment in Mounts's appeal, reverse his conviction for murder, and remand this cause for further proceedings consisting with this opinion and the law.

Judgment accordingly.

ZAYAS and CROUSE, JJ., concur.